1820.

LUPTON
v.
CORNELL.

---

### LUPTON and others *against* CORNELL and others.

*H.* purchased a lot of land of *J. S.*, and took a conveyance from him, and executed a mortgage to *J. S.* to secure a part of the purchase money. The mortgage was duly recorded in the county of *Onondaga*, where the lot was situated, but *H.* neglected to have his deed recorded, pursuant to the statute. The defendants, who had purchased the claim of a person in possession of the lot, without title, afterwards procured a release and quit-claim from *J. S.*, for the consideration of ten dollars, though the lot was worth six thousand dollars, and had it duly recorded, before the deed to *H.* was put on record : *Held*, that the record of the mortgage from *H.* to *J. S.* was sufficient evidence that *J. S.* had not any title to the lot; and that the subsequent release and quit-claim of *J. S.* was fraudulent ; and the defendants were decreed to execute a release to *H.* of such their pretended claim, so as to *quiet* the title of *H.*

*Nov.* 22d, 1819, and *Jan.* 4th, 1820.

THE bill, filed *April* 9th, 1817, stated, that the plaintiff, *Abraham Herring*, being indebted to the plaintiff, *W. Lup-*

*ton*, as trustee of *Margaret Anderson*, an infant, on the 1st of *June*, 1807, mortgaged to *L.*, to secure the bond of *H.* for 1,000 dollars, lot No. 6. in *Camillus*, in *Onondaga* county, containing 600 acres. That the mortgage was duly recorded on the 29th of *July*, 1807; and that the principal and interest, amounting to 1,682 dollars and 50 cents, remained due and unpaid, on the 1st of *March*, 1817. *H.*, on the 8th of *March*, 1813, executed another mortgage of the same lot to the plaintiff, *S. Jones*, jun., to secure him against the endorsement of the note of *H.*, and which *Jones* was, afterwards, obliged to pay, for 2,500 dollars. That this mortgage was duly recorded on the 13th of *May*, 1813. That *N. Denise*, who had, by sundry mesne conveyances from the original patentee, and which were stated in the bill, become owner of the lot, sold and conveyed the same to *H.*, on the 23d of *November*, 1796, and *H.* sold and conveyed it, on the 19th of *April*, 1797, to *James Stewart*, for 1,495 pounds. That *J. S.*, on the 1st of *July*, 1805, sold and conveyed the same lot to *H.* for 3,000 dollars; and on the 2d of *July*, 1805, *H.* mortgaged the lot to *J. S.* to secure the payment of 2,000 dollars, which mortgage was duly registered in *November*, 1805, in *Onondaga* county; and was afterwards paid off by *H.*, and the registry thereof cancelled on the 9th of *March*, 1812. That all the deeds for the said lot, except the release of the 1st of *July*, 1805, from *J. S.* to *H.*, were duly recorded, and that deed was omitted, by accident, to be recorded, until the 12th of *May*, 1815, having been duly acknowledged by *J. S.*, on the 22d of *July*, 1805.

The bill charged, that the defendants, *Paul Cornell*, *Walter Wood*, and *Giles Howland*, with notice of the facts above stated, and having good reason to believe that *J. S* had conveyed to *Herring*; but discovering that the deed had not been recorded, they, or one of them, on the 9th of *November*, 1813, under false and fraudulent pretences, and with the fraudulent design to defeat the mortgages above mentioned, procured

1820.

LUPTON
v.
CORNELL.

*J. S.*, for 100 dollars, (the lot then being worth 6,000 dollars,) to execute a release and quit-claim of all his right and title to the lot to the defendant *C.*, which the defendants caused to be recorded in *Onondaga* county, on the 6th of *December*, 1813. That the plaintiffs are desirous that the lot should be sold to satisfy the mortgage ; and that the defendants refuse to give up the quit-claim deed from *J. S.* &c. *Prayer*, that the defendant be decreed to deliver up the said release and quit-claim from *J. S.* to be cancelled, and to release all pretence of right and title to the said lot, &c. ; and that the mortgaged premises be decreed to be sold to pay the sums due on the mortgages, according to their priority, and the surplus, if any, paid to *Herring*, &c.

The answer of the defendant *C.* stated, that the three defendants, on the 16th of *November*, 1809, for a valuable consideration, purchased the lot in question of *Parker Burnham*, who pretended to be seised of the lot ; and the deed was taken in the name of *C.*, though all the defendants were jointly interested. That the defendants took possession of the lot, and have made improvements thereon. That in the autumn of 1812, the defendant *Wood* was informed, that *J. Stewart*, of the city of *New-York*, claimed title to the lot ; that *W.* had the principal agency in the management of the lot, and instructed the defendant *Howland* to purchase of *J. S.* a release of his claim or title, if it could be obtained for a trifling consideration. That *Howland*, accordingly, in the autumn of 1813, procured from *J. S.* a release or quit-claim of the lot, for ten dollars, which was acknowledged and recorded. This defendant denied all agency in the purchase of *J. S.*, further than conversing with *W.* on the expediency of making it. He denied all the charges of fraud, &c. He admitted that the lot, in *November*, 1813, was worth 6,000 dollars.

The defendant, *Howland*, in his answer, stated, that *W.* informed him that he had found a deed for the lot, on record, from *Herring* to *J. S.*, and could not discover that *J. S.* had sold

the lot; and instructed *Howland,* who was going to the city of *New-York,* in *November,* 1813, to purchase the claim of *J. S.* for a sum not exceeding 50 dollars. That *Howland* accordingly applied to *J. S.,* and procured a release and quit-claim, dated *November* 9th, 1813, for 10 dollars, to the defendant *C.,* which he delivered to *W.,* who procured it to be recorded on the 6th of *December,* 1813. That when *Howland* called on *J. S.* to know whether he had any claim or title to the lot, *J. S.* said, " that he had formerly purchased the lot, by which he had lost a considerable sum of money, and had met with other losses, in consequence of which, and his advanced age, he should give himself no further trouble about the lot." That he agreed to accept five dollars for a release ; but the next day, refused to leave his work, to go and execute the deed, for less than ten dollars, which the defendant gave him. The defendant denied all fraud, &c. He admitted that the lot, in *November,* 1813, was worth 6,000 dollars.

The defendant *Wood,* in his answer, admitted that he was jointly concerned in the purchase of the lot from *Burnham,* and that on the 15th of *June,* 1810, *C.* conveyed to him, *W.,* a moiety of the lot. He stated that he and *C.,* some time previous to the fall of 1812, were informed that there was a deed on record for the lot to *J. S.* from *A. Herring.* That they consulted about the expediency of buying that title. That the defendant *W.* had " doubts as to the validity of the title of *J. S.* to the lot." That in *October,* 1813, not discovering any deed or mortgage from *J. S.* on record, " though he does not at this time recollect that he searched, or caused search to be made, in the office, relative to the registry of mortgages," he instructed *Howland* to buy the lot of *J. S.,* for a sum not exceeding 50 dollars ; and *H.,* accordingly, procured, for ten dollars, a release and quit-claim from *J. S.,* which this defendant had recorded on the 6th of *December,* 1813. That in *April,* 1817, he wrote to a

1820.

LUPTON
v.
CORNELL.

person (*W. T. B.*) in *New-York*, to inquire whether the defendant *H.* had any information, at the time he purchased of *J. S.*, of a previous deed from *J. S.* to *Herring*, or to any other person; and that he received an answer, dated *June* 27th, 1817, stating, that *J. S.* said, that he was called on in 1813, by a young man, respecting the lot, who was told that he, *J. S.*, had sold it; but being very urgent, *J. S.* gave him a quit-claim, not supposing that it could affect his sale to *Herring*. The defendant *W.* denied all previous information of the deed from *J. S.* to *Herring*, or that he had any reason to suppose there was such a deed, except from the letter above mentioned. He denied all the charges of fraud, &c. He admitted that the lot, in *November*, 1813, was worth 4,800 dollars. That on the 5th of *May*, 1812, he conveyed 50 acres of the lot to *Jonas C. Baldwin*; and on the 13th of *April*, 1816, conveyed 50 acres of the lot to *W.* for 400 dollars, &c.

The cause was heard on the pleadings and proofs, in *June*, 1819, when it was decreed, that the title of the defendants was fraudulent, and they were directed to release their pretended title to *Herring*, the mortgagor; and the mortgaged premises were directed to be sold, to satisfy the mortgages, &c.

The defendants petitioned for a rehearing, which was *Nov. 22d,* granted; and the cause was, this day, argued, on the rehearing, by *H. Sedgwick*, for the defendants, and *S. Jones*, for the plaintiffs.

*Jan.4th,*1820.  THE CHANCELLOR. The bill is to foreclose two mortgages upon lot No. 6, in *Camillus*, and executed by *Abraham Herring*, the one to the plaintiff *Lupton*, and the other to the plaintiff *Jones*. The title of *Herring* is spread out upon the bill, and deduced down from the original patentee. The chain of title is regular and perfect, but there was a

delay of nearly ten years in putting upon record the deed from *James Stewart* to *Herring*, of the 1st of *July*, 1805. In the mean time, the defendants fraudulently procured a release and quit-claim from *Stewart*, for a nominal consideration, and placed it upon record before the prior and genuine deed from *Stewart* was recorded. The bill charges this fraud upon the defendants, and in addition to the usual prayer for a sale of the mortgaged premises, the bill seeks to have the quit-claim deed cancelled, and the pretence of title, on the part of the defendants, released.

The cause was brought to a hearing at the last *June* term, upon the pleadings and proofs, and the claim, on the part of the plaintiffs, appeared to be so just, and the fraud, and want of title, on the part of the defendants, so manifest, that it was almost, as of course, decreed, that the mortgaged premises be sold, in the usual way, to satisfy the mortgage debts, and that the defendants execute to the mortgagor a release of their pretence of title, with covenants against their own acts. Two parts of the mortgaged premises of fifty acres each, were excepted out of the decree of sale, having been sold and conveyed by the defendants previous to the filing of the bill, but the defendants were directed to account for the proceeds of the sale of those two parcels.

Upon this decree, a rehearing has been asked for and obtained, and the propriety of the decree has been discussed and considered. The defendants, by this re-examination of the merits, have made it incumbent upon me to discuss the transaction with an explicitness and freedom, which I wished to avoid.

That the quit-claim deed from *Stewart* to the defendant, *Cornell*, for the joint use and benefit of all the defendants, was fraudulently procured, cannot admit of any doubt. The defendants assume to be equally interested in the lot, and every act in relation to the title seems to have been considered as an act equally affecting all of them. They set up no other title than a deed from one *Parker Burnham*,

of the 15th of *November*, 1809. We are to presume him to have been a mere occupant, for no title in him is pretended; and when the defendants procured that deed, they must have known, or were bound to know, he had no title, for all titles to the military lands had, by a statute long previously existing, been required to be put upon record. The defendant, *Wood*, resided in the county of *Cayuga*, and was, no doubt, well skilled in the law relative to the military titles. There was evidence sufficient upon record to show, that the title was not in *Burnham*. The defendant *Wood* says, that he had discovered, " at some period previous to the fall of 1812," that *Stewart* had a deed upon record from *Herring*. How long before that period, he had made the discovery, does not appear. It is probable, he had made it *before* he took a deed from *Burnham*, as the deed from *Herring* to *Stewart* was recorded in 1797. After making that discovery, he and the defendant *Cornell*, consulted with each other as to the expediency of buying *Stewart's* title, and he had " doubts as to the validity of the title of the said *James Stewart*, to the said lot." These doubts could not have arisen from any belief in the title of *Burnham*, (for that title appears not to have had any source or foundation,) but from the plain and unerring language of the public records, which he was in the habit of searching. There was a mortgage duly registered on the 1st of *November*, 1805, from *Herring* to *Stewart*, and that registry was evidence sufficient to satisfy any man of common sense, that the title which was in *Stewart*, in 1797, had passed out of him, and was in *Herring* in 1805. Had not this defendant inspected that registry? He says, indeed, that " he does not, at this time, recollect that he searched, or caused search to be made, in the office, relative to the registry of mortgages," when he instructed the defendant *Howland*, in *October*, 1813, to go to *Stewart*, in *New-York*, and buy the lot of him, for a sum not exceeding fifty dollars. Can there be higher or more decisive proof, that he then

1820.

LUPTON
v.
CORNELL.

*knew* that *Stewart* had parted with his title? He admits, that he had long before discovered upon record the deed from *Herring* to *Stewart;* and he admits, that the lot was then worth from 4,800 dollars to 6,000 dollars, and yet he sends an agent to buy up *Stewart's* title, for a sum not exceeding fifty dollars. The proposition imports fraud on the very face of it. He intended to defraud the real owner, who then held the title derived from *Stewart.* The manner in which this agency was executed, appears from the answer of *Howland,* one of the associates in the purchase.

*Howland* says, that in pursuance of his instructions, he applied to *Stewart,* in the city of *New-York,* and procured his release and quit-claim, for ten dollars, though the sum inserted in the deed, as the consideration, was 100 dollars. He says, that when he called on *Stewart* to know if he had any claim or title to the lot, the latter said, that " he had formerly purchased the lot, by which he had lost a considerable sum of money, and that he had met with other losses, in consequence of which, and his advanced age, he should give himself no further trouble about it." *Stewart* then agreed to execute a release, for five dollars, but on the next day, he refused to leave his work and go and execute the release, for less than ten dollars, which were given him.

The story, as to the reply of *Stewart,* is absurd. The defendant, *Howland,* meant to be understood, that *Stewart* then considered himself as owner of the lot, yet that he set no value upon it, though in 1797 he had given 1,495 pounds for that and three other military lots. The true account of the interview is given by *Stewart* and his wife, who both prove the answer of *Howland* to be false. They testify, that when the application was made to *S.* for the release, he told *Howland* that he had before conveyed the lot to *Herring,* and he referred the applicant to him. That *Howland* (whom he did not then know) repeatedly called upon him, and urged the execution of a quit-claim deed, and represent-

ed to him that it would injure no person. That he, sup-posing that *H.* had purchased of *Herring,* executed the deed. *Howland* says, he delivered the release so purchased, to the defendant *Wood,* and *Wood* admits he received it, and caused it to be recorded, on the 6th of *December,* 1813.

The other defendant, *Cornell,* says, that *Wood* had the principal agency and management of the lot, and he admits, that *Howland* was instructed by *Wood* to procure the re-lease, and that he and *Wood* had previously conversed re-specting the expediency of procuring it.

Here was, then, a quit-claim fraudulently procured from *Stewart,* with intent to defraud the legal owner under *Stewart,* and it was procured on the joint consultation and act of all the defendants. One of them, who was the agent under *Wood* in procuring it, is detected in positive falsehood and fraud; and are we not bound to conclude, from the over-whelming force of the circumstances, that *Cornell,* who ad-vised it, and *Wood,* who instructed the agent to procure it, for a nominal sum, and who received it immediately after-wards, and had it recorded, were equally guilty? I am entirely satisfied, that all the defendants are chargeable with actual fraud.

Upon the ground of that fact, the decree in *June* was cor-rect. If the defendants had any good title, they should have put it forward. They have chosen to set up a claim under a third person, in whom no manner of title appears, either from their own answers, or from the proof, and they have chosen to bring forward a quit-claim deed taken pur-posely to defraud the plaintiff *Herring.* The title of the plaintiff *Herring,* is deduced from the fountain head, and appears to be sound and unbroken. It is, therefore, just and equitable, that the plaintiffs should be quieted in their title against all claim and pretension in the defendants. It is the duty of the Court to clear the title, under the allega-tions and proofs in the case, before the mortgaged premises

are exposed to sale, and not leave purchasers under the decree to be embarrassed and exposed to further litigation.

The decree of the 23d day of *June* last is, in every respect, confirmed, together with the additional costs of this rehearing.